130 T.C. No. 12

UNITED STATES TAX COURT

THOMAS H. HOLMAN, JR. AND KIM D.L. HOLMAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7581-04.                    Filed May 27, 2008.

        Ps transferred D stock of substantial value to a
newly formed family limited partnership and then made
gifts of limited partnership units (LP units) to a
custodian for one of their children and in trust for
the benefit of all of their children.  Ps made a large
gift in 1999 and smaller gifts in 2000 and 2001.  In
valuing the gifts for Federal gift tax purposes, they
applied substantial discounts for minority interest
status and lack of marketability.  With respect to the
1999 gift, R argues that the gift should be treated as
an indirect gift of D shares and not as a direct gift
of LP units.  For all of the gifts treated as gifts of
LP units, R argues that the restrictions in the
partnership agreement on a limited partner's right to
transfer her interest should be disregarded pursuant to
I.R.C. sec. 2703(a)(2).  R also disagrees with Ps'
application of discounts.

        1.  <u>Held</u>:  The limited partnership was formed and
the shares of D stock were transferred to it almost 1
week in advance of the 1999 gift, so that, on the facts
before us, the transfer cannot be viewed as an indirect
gift of the shares to the donees under sec. 25.2511-
1(a) and (h)(1), Gift Tax Regs.

2.  Held, further, the 1999 gift may not be viewed as an indirect gift of the shares to the donees under the step transaction doctrine.

3.  Held, further, in valuing the gifts, the transfer restrictions are disregarded pursuant to I.R.C. sec. 2703(a)(2).

4.  Held, further, values of the gifts determined.


John W. Porter, Stephanie Loomis-Price, and J. Graham Kenney, for petitioners.

Lillian D. Brigman and Richard T. Cummings, for respondent.


HALPERN, Judge:  By separate notices of deficiency (the notices), respondent determined deficiencies in each petitioner's Federal gift tax of $205,473, $8,793, and $16,009 for 1999, 2000, and 2001, respectively.  In response to the notices, petitioners jointly filed a single petition.  Respondent answered, and, by amendment to answer, he increased by $2,304 and $13, the deficiencies he had determined for each petitioner for 1999 and 2001, respectively.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the principal issues for decision are (1) whether petitioners' transfer of assets to a family limited partnership constitute an indirect gift to another member of the partnership; (2) if not, whether, in valuing the gifts of limited

partner interests that are the subject of this litigation, we must disregard certain restrictions on the donees' rights to sell those interests; and (3) assuming that we must value those interests, those values.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference. Petitioners resided in St. Paul, Minnesota, at the time they filed the petition.

Background

Petitioners are husband and wife. They have four minor children, the initials of whose first names are L., C., V., and I. (collectively, the children).

Petitioner Thomas H. Holman, Jr. (Tom), was employed by Dell Computer Corp. (Dell) from October 1988 through November 2001. While employed by Dell, Tom received substantial stock options, some of which he has exercised. Tom and petitioner Kim D.L. Holman (Kim) have purchased additional shares of Dell stock.

In 1996 and 1997, as their net worth increased, petitioners grew more concerned with managing their wealth, particularly as their wealth might affect the children.

Texas UTMA Accounts

Beginning in 1996, when they lived in Texas, and continuing through early 1999, petitioners made annual gifts of Dell stock to three custodial accounts under the Texas Uniform Transfer to Minors Act (Texas UTMA), one for each of their then three

daughters, L., C., and V.  Tom served as custodian for the three Texas UTMA accounts until August 1999, when, for estate planning reasons, he resigned and was replaced by his mother, Janelle S. Holman (Janelle).  At the time of his resignation, each of the Texas UTMA accounts held 10,030 shares of Dell stock.

Move to Minnesota and Discussions with Mr. LaFave

In August 1997, the Holman family moved from Texas to St. Paul, Minnesota.  At that time, petitioners had no wills.

In late 1997, petitioners met with business and estate planning attorney E. Joseph LaFave (Mr. LaFave) to discuss estate planning and wealth management issues.  They continued those discussions with Mr. LaFave and with others over the next 2 years.  They recognized that they were wealthy, and they anticipated transferring substantial wealth to the children. They wished to make the children feel responsible for the wealth they expected them to receive.  They discussed with Mr. LaFave and others various ways simultaneously to meet their goals of transferring their wealth to the children and making the children feel responsible for that wealth.  They learned from Mr. LaFave about family limited partnerships.  Mr. LaFave discussed with petitioners forming a partnership, contributing property to it, and making gifts of interests in the partnership to (or for the benefit of) the children.  Mr. LaFave described, and Tom understood, the gift tax savings from valuation discounts that could result if Tom made gifts of limited partner interests rather than gifts of some or all of the property contributed to

the partnership. Tom discussed those tax savings with Kim. Tom's understanding of the potential for gift tax savings played a role in his decision to form a family limited partnership and make gifts (indirectly) to the children of limited partner interests. Tom had four reasons for forming a family limited partnership: "very long-term growth", "asset preservation", "asset protection", and "education". At trial, he elaborated:

> Long-term asset growth to us means that we're looking at assets for the benefit of the family over decades. Preservation really means that we wanted a vehicle where our children would be demotivated and disincentivized to spend the assets. Protection -- we were worried that the assets that the girls would eventually come into would be sought after by third party people, friends, spouses, potential creditors. The fourth one [education] is interesting in that we wanted something that we could use to educate our daughters on business management concerns.

He further elaborated on his understanding of asset preservation: "The preservation of capital is important to us. We did not want our daughters to just go blow this money." And: "[W]e really are concerned about negatively affecting their lives with the wealth, so by creating a partnership, we can establish a vehicle that preserves the wealth and such that the kids won't go off and spend it." Asset preservation motivated Tom to include transfer restrictions in the limited partnership agreement described infra. He testified with respect to those restrictions: "Remember, the big goal of this thing is to preserve the assets and to disincentivize the girls from getting rid of these assets, spending these assets, feeling entitled to these assets."

Minnesota UTMA Account

I., the Holmans' youngest daughter, was born in June 1999. In August 1999, Tom opened an account at Dean Witter (now Morgan Stanley Dean Witter; hereafter, MSDW) for I.'s benefit.  He opened the account under the Minnesota Uniform Transfers to Minors Act (Minnesota UTMA).  Janelle was appointed custodian. Tom caused MSDW to transfer 30 shares of Dell stock to that account on August 16, 1999.

Wills

On November 2, 1999, petitioners executed wills prepared by Mr. LaFave.

The Trust

Mr. LaFave drafted an agreement (the trust agreement) establishing "The Holman Irrevocable Trust U/A dated September 10, 1999" (the trust).  The trust agreement names petitioners as grantors, Janelle as trustee, and the children as the primary beneficiaries.  Petitioners executed the trust agreement on November 2, 1999, and Janelle executed it on November 4, 1999. The trust agreement provides that it is effective as of September 10, 1999.  Previously, on August 3, 1999, Tom had opened an account at MSDW for the to-be-established trust.  Tom caused MSDW to transfer 100 shares of Dell stock and $10,000 to that account on August 16, 1999.

The Holman Limited Partnership

An attorney in Mr. LaFave's office drafted an agreement (the partnership agreement) to establish the Holman Limited Partnership (the partnership), a Minnesota limited partnership. The partnership agreement recites that petitioners are both general and limited partners and Janelle, as trustee of the trust (as trustee) and as custodian, separately, for each of the children, is a limited partner. Tom suggested changes to preliminary drafts of the partnership agreement to insure that his goals of long-term growth, asset preservation, asset protection, and education were reflected in the final agreement. Petitioners executed the partnership agreement on November 2, 1999. Janelle executed it thereafter.

November 2, 1999, Transfers

On November 2, 1999, Janelle, as trustee, caused MSDW to transfer 100 shares of Dell stock from the trust's account to a new MSDW account established for the partnership (the partnership's account). On that same date, Tom caused MSDW to transfer 70,000 shares of Dell stock owned one-half by him and one-half by Kim from another MSDW account to the partnership's account. In exchange for their contributions to the partnership, petitioners and Janelle, as trustee, received the following general and limited partner interests:[1]

---

[1] Each contributor received an interest in the partnership equal to the number of Dell shares contributed by that individual divided by the total number of Dell shares contributed by all of the individuals. In that respect, no distinction was drawn
(continued...)

## Table 1

| Partner | Class | Shares of Dell Stock Contributed | Partnership Units | % Owned |
|---------|---------|---------|---------|---------|
| Tom | General | 625 | 89.16 | 0.89 |
| Kim | General | 625 | 89.16 | 0.89 |
| Tom | Limited | 34,375 | 4,903.71 | 49.04 |
| Kim | Limited | 34,375 | 4,903.71 | 49.04 |
| Trust | Limited | 100 | 14.26 | 0.14 |
| Total | | 70,100 | 10,000.00 | 100.00 |

The partnership was formed on November 3, 1999, pursuant to the partnership agreement and the laws of Minnesota, when a certificate of limited partnership for it was filed with the Minnesota secretary of state.

Since its creation, the partnership has been a validly existing Minnesota limited partnership.

Partnership Agreement

The following are among the provisions of the partnership agreement:

> 1.6  Family.  "Family" means Thomas H. Holman, Jr. and Kim D.L. Holman and their descendants.

> 1.7  Family Assets.  "Family Assets" mean all property owned by the Family, individually, in trust or in combination with others, which has been contributed to or acquired by the Partnership.

> \*       \*       \*       \*       \*       \*       \*

> 3.1  Purposes.  The purposes of the Partnership are to make a profit, increase wealth, and provide a means for the Family to gain knowledge of, manage, and preserve Family Assets.  The Partnership is intended to accomplish the following:

---

[1](...continued)
between general and limited partner interests.

(1)  maintain control of Family Assets;

(2)  consolidate fractional interests in Family
     Assets and realize the efficiencies of
     coordinated investment management;

(3)  increase Family wealth;

(4)  establish a method by which gifts can be made
     without fractionalizing Family Assets;

(5)  continue the ownership of Family Assets and
     restrict the right of non-Family persons to
     acquire interests in Family Assets;

(6)  provide protection to Family Assets from
     claims of future creditors against Family
     members;

(7)  provide flexibility in business planning not
     available through trusts, corporations, or
     other business entities;

(8)  facilitate the administration and reduce the
     cost associated with the disability or
     probate of the estates of Family members; and

(9)  promote the Family's knowledge of and
     communication about Family Assets.

            *    *    *    *    *    *    *

6.1  <u>Management</u>.  The General Partners shall have
exclusive management and control of the business of the
Partnership, and all decisions regarding the management
and affairs of the Partnership shall be made by the
General Partners.  * * *  [Specifically,] they shall
have the power and authority * * * :

(1)  to determine the investments and investment
     strategy of the Partnership;

            *    *    *    *    *    *    *

8.4  <u>No Withdrawal</u>.  No Limited Partner may
withdraw from the Partnership except as may be
expressly provided in this Agreement.

            *    *    *    *    *    *    *

9.1  <u>Assignment of Interest</u>.  A Limited Partner
may not without the prior written consent of all

Partners assign (including by encumbrance), whether voluntarily or involuntarily, all or part of his or her Interest in the Partnership, except as permitted by this Agreement.  * * *

9.2  Permitted Assignments.  A Limited Partner may assign all or any portion of his or her Interest in the Partnership to a revocable trust the entire beneficial interest of which is owned by the Partner.  In addition, a Limited Partner may assign all or any portion of his or her Interest in the Partnership, at any time or from time to time, during lifetime or upon death, to a Family member; to a custodian for a Family member under an applicable Uniform Transfers to Minors Act; to another Partner; or to trustees, inter vivos or testamentary, holding property in trust for Family members (notwithstanding that someone who is not a Family member may also be a beneficiary of such trust.) * * *

9.3  Acquisition of Partnership Interest in Event of Non-Permitted Assignment.  If an assignment of a Partnership Interest occurs which is prohibited or rendered void by the terms of this Agreement, but the General Partners determine that such assignment is nevertheless effective according to then applicable law,[2] the Partnership shall have the option (but not the obligation) to acquire the Interest of the assignee or transferee upon the following terms and conditions:

(1)  The Partnership will have the option to acquire the Interest by giving written notice of its intent to purchase to the transferee or assignee within ninety (90)days from the date the Partnership is notified in writing of the transfer or assignment.

(2)  Unless the Partnership and the transferee or assignee agree otherwise, the purchase price for the Interest, or any fraction to be acquired by the Partnership, shall be its fair market value based upon the assignee's right to share in distributions from the Partnership, as determined by an appraisal performed by an independent appraiser selected by the General Partners.

---

[2]  As examples of assignments of a partnership interest that would be violative of the partnership agreement but still effective, petitioners suggest transfers upon death or divorce of a limited partner and a transfer to a creditor.

(3)    The valuation date for the determination of the purchase price of the Interest will be the date of death in the case of an assignment due to death or, in all other cases, the first day of the month following the month in which the Partnership is notified in writing of the assignment.

(4)    The closing of the purchase of the Interest shall occur no later than one hundred eighty (180) days after the valuation date, as defined in (3) above.

(5)    In order to reduce the burden upon the resources of the Partnership, the Partnership will have the option, to be exercised in writing delivered at closing, to pay ten percent (10%) of the purchase price at closing and pay the balance of the purchase price in five (5) equal annual installments of principal (or equal annual installments over the remaining term of the Partnership if less than five (5) years), together with interest at the Applicable Federal Rate (as that term is defined in the Code) which is in effect for the month in which the closing occurs.  The first annual installment of principal, with accrued interest, will be due and payable exactly one year after the date of closing, and subsequent annual installments of principal, with accrued interest, will be due and payable each year thereafter on the anniversary date of the closing until five (5) years after the date of closing (or shorter term, if applicable), when the remaining amount of the obligation, with unpaid accrued interest, shall be paid in full.  The Partnership will have the right to prepay all or any part of the remaining obligation at any time without penalty.

(6)    By consent of the Partners (other than the Partner whose interest is to be acquired), the General Partners may assign the Partnership's option to purchase to one or more Partners and when done, any rights or obligations imposed upon the Partnership will instead become, by substitution, the rights and obligations of such Partners.

(7)    If the option to purchase under this paragraph 9.3 is not exercised, the assignee

may retain the assigned Interest provided the assignee agrees in writing to be bound by the terms and conditions of this Agreement. The assignee shall not become a Limited Partner unless all of the other Partners consent, which consent may be granted or withheld in their sole discretion, and the other conditions for admission contained in this Article IX are satisfied. The rights of an assignee who does not become a Limited Partner shall be limited to the right to receive, to the extent assigned, only the distributions to which the assignor would be entitled under this Agreement.

\*       \*       \*       \*       \*       \*       \*

12.1  Events Causing Dissolution. The Partnership shall be dissolved and its affairs shall be wound up upon the first to occur of the following:

(1)  on December 31, 2049, \* \* \* ;

\*       \*       \*       \*       \*       \*       \*

(4)  written consent of all Partners; \* \* \*

\*       \*       \*       \*       \*       \*       \*

November 8, 1999, Gift

As of November 8, 1999, petitioners made a gift of limited partner interests (LP units) in the partnership to Janelle, both as custodian for I. under the Minnesota UTMA and as trustee. Apparently, the gift to Janelle as custodian for I. was one step in petitioners' plan to equalize gifts among their daughters. Each petitioner transferred (1) 713.2667 LP units (together, 1,426.5334 LP units) to Janelle as custodian for I. and (2) 3,502.6385 LP units (together, 7,005.367 LP units) to Janelle as trustee. As a result of that gift, the partnership was owned as follows:

Table 2

| Partner | Class | Partnership Units | % Owned |
|---|---|---|---|
| Tom | General | 89.16 | 0.89 |
| Kim | General | 89.16 | 0.89 |
| Tom | Limited | 687.76 | 6.88 |
| Kim | Limited | 687.76 | 6.88 |
| Trust | Limited | 7,019.63 | 70.20 |
| I. Custodianship | Limited | 1,426.53 | 14.26 |
| Total | | 10,000.00 | 100.00 |

Each petitioner timely filed a Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, for 1999, electing to split gifts (i.e., treating gifts made to third parties as being made one-half by each spouse) and reporting the fair market value of the November 8, 1999, transfer of LP units from each petitioner (one-half of the total gift) as $601,827 on the basis of an independent appraisal of the LP units transferred. The appraiser making that appraisal applied a discount of 49.25 percent to the partnership's net asset value (the value of the Dell shares) in reaching his conclusion as to the value of 1 LP unit on November 8, 1999.

December 13, 1999, Transfers

On December 13, 1999, MSDW transferred 10,030 shares of Dell stock to the partnership's account from each of three custodial accounts maintained for L., C., and V. under the Texas UTMA.

Also on December 13, 1999, MSDW transferred 30 shares of Dell stock to the partnership's account from the custodial account maintained for I. under the Minnesota UTMA.

As a result of those transfers, the partnership owned 100,220 shares of Dell stock, and the partners held interests in the partnership as follows:[3]

Table 3

| Partner | Class | Partnership Units | % Owned |
|---|---|---|---|
| Tom | General | 89.16 | 0.62 |
| Kim | General | 89.16 | 0.62 |
| Tom | Limited | 687.76 | 4.81 |
| Kim | Limited | 687.76 | 4.81 |
| Trust | Limited | 7,019.63 | 49.10 |
| I. Custodianship | Limited | 1,430.81 | 10.01 |
| L. Custodianship | Limited | 1,430.81 | 10.01 |
| C. Custodianship | Limited | 1,430.81 | 10.01 |
| V. Custodianship | Limited | 1,430.81 | 10.01 |
| Total | | 14,296.71 | 100.00 |

## January 4, 2000, Gift

As of January 4, 2000, petitioners transferred 469.704 LP units to Janelle as custodian, one quarter (117.426 LP units) for each of the daughters.

As a result of those transfers, interests in the partnership were held as follows:

---

[3] Janelle, as custodian for the various custodial accounts, received a limited partner interest in the partnership equal to the number of Dell shares contributed from each account divided by the total number of Dell shares contributed then, or before, by all of the partners.

Table 4

| Partner | Class | Partnership Units | % Owned |
|---|---|---|---|
| Tom | General | 89.16 | 0.62 |
| Kim | General | 89.16 | 0.62 |
| Tom | Limited | 452.91 | 3.17 |
| Kim | Limited | 452.91 | 3.17 |
| Trust | Limited | 7,019.63 | 49.10 |
| I. Custodianship | Limited | 1,548.24 | 10.83 |
| L. Custodianship | Limited | 1,548.24 | 10.83 |
| C. Custodianship | Limited | 1,548.24 | 10.83 |
| V. Custodianship | Limited | 1,548.24 | 10.83 |
| Total | | 14,296.73 | 100.00 |

Each petitioner timely filed a Form 709 for 2000, electing to split gifts and reporting the fair market value of the January 4, 2000, transfer of LP interests from each petitioner (one-half of the total gift) as $40,000 on the basis of an independent appraisal of the LP interests transferred (which, as with the appraisal of the 1999 gift, applied a discount of 49.25 percent to the partnership's net asset value to determine the value of 1 LP unit on January 4, 2000).

January 5, 2001, Transfers

On January 5, 2001, petitioners contributed an additional 10,880 shares of Dell stock to the partnership (allocated as 5,440 from each), and each received 1,552.07 new LP units, which increased each of their limited partner interests in the partnership by 4.58 percent.

As a result of those transfers, the partnership owned 111,100 shares of Dell stock, and the partners held interests in the partnership as follows:[4]

Table 5

| Partner | Class | Partnership Units | % Owned |
|---|---|---|---|
| Tom | General | 89.16 | 0.56 |
| Kim | General | 89.16 | 0.56 |
| Tom | Limited | 1,229.08 | 7.75 |
| Kim | Limited | 1,229.08 | 7.75 |
| Trust | Limited | 7,019.63 | 44.29 |
| I. Custodianship | Limited | 1,548.24 | 9.77 |
| L. Custodianship | Limited | 1,548.24 | 9.77 |
| C. Custodianship | Limited | 1,548.24 | 9.77 |
| V. Custodianship | Limited | 1,548.24 | 9.77 |
| Total | | 15,849.07 | 99.99 |

## February 2, 2001, Gift

As of February 2, 2001, petitioners transferred 860.772 LP units to Janelle as custodian, one quarter (215.193 LP units) for each of the daughters.

As a result of those transfers, interests in the partnership were held as follows:

---

[4] Petitioners received limited partner interests equal to the number of Dell shares contributed by each divided by the total number of Dell shares contributed then, or before, by all of the partners.

## Table 6

| Partner | Class | Partnership Units | % Owned |
|---|---|---|---|
| Tom | General | 89.16 | 0.56 |
| Kim | General | 89.16 | 0.56 |
| Tom | General | 798.70 | 5.04 |
| Kim | Limited | 798.70 | 5.04 |
| Trust | Limited | 7,019.63 | 44.29 |
| I. Custodianship | Limited | 1,763.43 | 11.13 |
| L. Custodianship | Limited | 1,763.43 | 11.13 |
| C. Custodianship | Limited | 1,763.43 | 11.13 |
| V. Custodianship | Limited | 1,763.43 | 11.13 |
| Total | | 15,849.07 | 100.01 |

Each petitioner timely filed a Form 709 for 2001, electing to split gifts and reporting the fair market value of the February 2, 2001, transfer of LP interests from each petitioner (one-half of the total gift) as $40,000 on the basis of their estimates of the value of the transferred interests in the light of prior independent appraisals of LP interests transferred.

Assets and Operation of the Partnership

Upon formation of the partnership, Tom had no immediate plan other than that it would hold the Dell shares it had received. At no time from formation through 2001 did the partnership have a business plan.

The partnership has no employees and no telephone listing in any directory.

At formation and on each of the dates for valuing the transfers here in question, the partnership's assets consisted solely of shares of stock of Dell.

From the formation of the partnership through 2001, the partnership prepared no annual statements.

At the time Tom decided to create the partnership, he had plans to make the gifts of LP units that were made in 1999, 2000, and 2001.

The partnership had no income to report, and it filed no Federal income tax return for 1999, 2000, or 2001.

On December 5, 2001, the partnership received $67,573.84 on the sale of covered call options on some of its Dell shares. That transaction was not reportable for Federal income tax purposes until the following year, when the options expired.

Values of Dell Shares

For the dates indicated, the high, low, average, and closing prices of a share of Dell stock were as follows:

Table 7

| Date | High | Low | Average | Closing |
|------|------|-----|---------|---------|
| Nov. 2, 1999 | $41.19 | $40.13 | $40.660 | $41.1875 |
| Nov. 8, 1999 | 40.94 | 39.31 | 41.125 | 40.1250 |
| Jan. 4, 2000 | 49.25 | 46.50 | 47.875 | 46.6250 |
| Feb. 2, 2001 | 27.25 | 25.00 | 26.125 | 25.1875 |

The Notices

As pertinent to the issues before us, in support of each notice, respondent made the following adjustments with respect to the gifts of LP units described above:

## Table 8

### Gifts of LP Units

| Year | Respondent's Determined Value | Reported Value | Increase |
|------|-------------------------------|----------------|----------|
| 1999 | $1,184,684 | $601,827 | $582,857 |
| 2000 | 78,912 | 40,000 | 38,912 |
| 2001 | 78,760 | 40,000 | 38,760 |

Respondent explained those adjustments for 1999 as follows:

(1)  It is determined that the transfer of assets to the Holman Limited Partnership, [sic] is in substance an indirect gift within the meaning of I.R.C. Section 2511 of the assets to the other partners.

(2)  Alternatively, it is determined that in substance and effect the taxpayer's interest in Holman Limited Partnership is more analogous to an interest in a trust than to an interest in an operating business, and should be valued as such for federal transfer tax purposes.

(3)  Alternatively, it is determined that the transferred interest in the Holman Limited Partnership should be valued without regard to any restriction on the right to sell or use the partnership interest within the meaning of I.R.C. Section 2703(a)(2).

(4)  Alternatively, it is determined that certain restrictions on liquidation of the Holman Limited Partnership interests contained in the articles of organization and operating agreement should be disregarded for valuation purposes pursuant to I.R.C. Section 2704(b).

(5)  Alternatively, it is determined that the fair market value of such gifts is $871,971.00, after allowance of a discount for lack of marketability or minority interest of 28%.

Respondent's explanations of his adjustments for 2000 and 2001 are the same except that, in the fifth alternative, the

determination of the fair market value of the gifts is $56,817 and $56,707 for 2000 and 2001, respectively.

OPINION

## I. Introduction

Petitioners transferred Dell stock of substantial value to a newly formed family limited partnership and then made gifts of limited partnership units in the partnership (LP units) to a custodian for one of their children and in trust for the benefit of all of their children. Petitioners made a large gift in 1999 and smaller gifts in 2000 and 2001 (collectively, the gifts; individually, the 1999, 2000, or 2001 gift, respectively). In valuing the gifts for Federal gift tax purposes, they applied substantial discounts for minority interest status and lack of marketability. With respect to the 1999 gift, respondent argues that the gift should be treated as an indirect gift of Dell shares and not as a direct gift of LP units. For all of the gifts treated as gifts of LP units, respondent argues that the restrictions contained in the partnership agreement on a limited partner's right to transfer her interests in the partnership should be disregarded pursuant to section 2703(a)(2). Respondent also disagrees with petitioners' application of discounts. Respondent has abandoned his reliance on section 2704(b) ("Certain restrictions on liquidation disregarded."), and he no longer argues that the partnership should be treated as if it were a trust. We shall address respondent's remaining arguments in turn.

II.  Indirect Gifts

      A.  Law

     Section 2501(a) imposes a tax on the transfer of property by gift during the year.  The tax is imposed on the values of the gifts made during the year.  See sec. 2502(a).  The amount of a gift of property is the value thereof on the date of transfer.  See sec. 2512(a).  That value of a gift of property is determined by the value of the property passing from the donor and not necessarily by the measure of enrichment resulting to the donee from the transfer.  Sec. 25.2511-2(a), Gift Tax Regs.  Where property is transferred for less than adequate and full consideration in money or money's worth (hereafter, simply, adequate consideration), then the excess of the value of the property transferred over the consideration received is generally deemed a gift.  See sec. 2512(b).  The gift tax applies whether the gift is direct or indirect.  Sec. 2511(a).  Section 25.2511-1(h)(1), Gift Tax Regs., illustrates an indirect gift made by a shareholder of a corporation to the other shareholders of the corporation.  The shareholder transfers property to the corporation for less than adequate consideration.  The regulation concludes that, generally, such a transfer represents gifts by the shareholder to the other individual shareholders to the extent of their proportionate interests in the corporation.  Similarly, if a partner transfers property to a partnership for less than adequate consideration, the transfer generally will be treated as an indirect gift by the transferor to the other

partners.  See, e.g., <u>Shepherd v. Commissioner</u>, 115 T.C. 376, 389 (2000), affd. 283 F.3d 1258 (11th Cir. 2002).  Indeed, in affirming the Tax Court, the Court of Appeals said:  "[G]ifts to a partnership, like gifts to a corporation, are deemed to be indirect gifts to the stakeholders 'to the extent of their proportionate interests' in the entity.  See * * * [sec. 25.2511-1(h)(1), Gift Tax Regs.]."  <u>Shepherd v. Commissioner</u>, 283 F.3d at 1261.

B.  <u>Parties' Arguments</u>

1.  <u>Respondent's Indirect Gift Arguments</u>

Respondent's arguments are simple and straightforward:

> The gift tax is imposed on the donor, and is based on the value of the transferred property on the date of the gift.  * * *  Here, the property that passed from the donors is Dell stock, not the * * * LP units. Therefore, Tom and Kim's transfers of Dell stock, not the * * * LP units, as of November 8, 1999, are taxed under the terms of § 2501(a)(1).

> Alternatively, the formation, funding, and gifts of * * * LP units dated as of November 8, 1999 are steps of an integrated donative transaction.  Once the intermediate steps are collapsed, Tom and Kim's gifts are gifts of Dell stock in the form of * * * LP units. * * *

2.  <u>Petitioners' Responses</u>

Petitioners' responses are equally simple and straightforward:

> First, no donative transfer occurred on formation of the Partnership because each partner contributed Dell stock to the Partnership, and each received interests in the Partnership precisely in proportion to the assets contributed by each.  Further, because the Partnership was clearly and properly established under Minnesota law on November 3, 1999, Petitioners' gifts of Partnership interests on November 8, 1999, to the Trust and to the Minnesota UTMA Account cannot

constitute indirect gifts of the Dell stock owned by the Partnership on that date.

C.  Discussion

1.  A Gift to the Partners on Account of a Transfer to the Partnership

Respondent's first alternative indirect gift argument invokes the illustration in section 25.2511-1(h)(1), Gift Tax Regs., of an indirect gift made by a shareholder of a corporation to the other shareholders of the corporation.  The regulation concludes that, generally, where a shareholder transfers property to a corporation for less than adequate consideration, the transfer represents gifts by the shareholder to the other shareholders to the extent of their proportionate interests in the corporation.  Respondent asks us to compare the facts at hand to the facts in Shepherd and in Senda v. Commissioner, T.C. Memo. 2004-160, affd. 433 F.3d 1044 (8th Cir. 2006), in both of which we concluded that transfers by a partner to a partnership were indirect transfers to the other partners.

In Shepherd v. Commissioner, 115 T.C. at 380-381, the taxpayer transferred real property and shares of stock to a newly formed family partnership in which he was a 50-percent owner and his two sons were each 25-percent owners.  Rather than allocating contributions to the capital account of the contributing partner, the partnership agreement provided that any contributions would be allocated pro rata to the capital accounts of each partner according to ownership.  Id. at 380.  Because the contributions were reflected partially in the capital accounts of the

noncontributing partners, the values of the noncontributing partners' interests were enhanced by the contributions of the taxpayer. Accordingly, we held that the transfers to the partnership were indirect gifts by the taxpayer to his sons of undivided 25-percent interests in the real property and shares of stock. Id. at 389.

In Senda v. Commissioner, supra, the Commissioner contended that the taxpayers' transfers of shares of stock to two family limited partnerships, coupled with their transfers of limited partner interests to their children, were indirect gifts of the shares to those children. In both instances, the stock transfers and the transfers of the partnership interests occurred on the same day. We said that the taxpayers' transfers of shares were similar to the transfer of property in the Shepherd case: "In both cases, the value of the children's partnership interests was enhanced by their parents' contributions to the partnership." We rejected the taxpayers' attempt to distinguish the Shepherd case on the ground that they first funded the partnership and then transferred the partnership interests to their children. We found: "At best, the transactions were integrated (as asserted by respondent) and, in effect, simultaneous." We held that the taxpayers' transfers of the shares of stock to the two partnerships were indirect gifts of the shares to their children.

The facts in the instant case are distinguishable from those of both the Shepherd and Senda cases. On November 3, 1999, the partnership was formed, petitioners transferred 70,000 Dell

shares to the partnership, and Janelle, as trustee, transferred 100 Dell shares to the partnership. On account of those transfers, petitioners and Janelle received partnership interests proportional to the number of shares each transferred to the partnership. It was not until November 8, 1999, that petitioners are deemed to have made (and, on that date, they did make)[5] a gift of LP units to Janelle, both as custodian for I. under the Minnesota UTMA and as trustee. Petitioners did not first transfer LP units to Janelle and then transfer Dell shares to the partnership, nor did they simultaneously transfer Dell shares to the partnership and LP units to Janelle. The facts of the Shepherd and Senda cases are materially different from those of the instant case, and we cannot rely on those cases to find that petitioners made an indirect gift of Dell shares to Janelle, either as custodian for I. under the Minnesota UTMA or as trustee. We shall proceed to respondent's alternative argument.

---

[5] On the basis of stipulated facts, we have found that, "[a]s of November 8, 1999," petitioners made a gift of LP units to Janelle, both as custodian for I. under the Minnesota UTMA and as trustee. The stipulated facts are based on undated instruments assigning the LP units "effective November 8, 1999". On the basis of a stipulated fact, we have also found that petitioners each filed a 1999 gift tax return reporting the fair market value of "the November 8, 1999," transfer of LP units. The parties have also stipulated an appraisal of that gift that recites that the gift was made on Nov. 8, 1999. Respondent's valuation expert, Francis X. Burns, assumed that the 1999 gift was made on Nov. 8, 1999, as did petitioners' valuation expert, Troy D. Ingham. While it is not free from doubt, we conclude, and find, that the 1999 gift was made on Nov. 8, 1999. For similar reasons, we conclude and find that the gifts made "as of" Jan. 4, 2000, and Jan. 5, 2001, were made on those dates, respectively.

2. Indirect Gift Under the Step Transaction Doctrine

Alternatively, respondent argues that petitioners made an indirect gift under the step transaction doctrine. As we recently summarized that doctrine in Santa Monica Pictures, L.L.C. v. Commissioner, T.C. Memo. 2005-104:

> The step transaction doctrine embodies substance over form principles; it treats a series of formally separate steps as a single transaction if the steps are in substance integrated, interdependent, and focused toward a particular result. Penrod v. Commissioner, 88 T.C. 1415, 1428 (1987). "Where an interrelated series of steps are taken pursuant to a plan to achieve an intended result, the tax consequences are to be determined not by viewing each step in isolation, but by considering all of them as an integrated whole." Packard v. Commissioner, 85 T.C. 397, 420 (1985).
>
> There is no universally accepted test as to when and how the step transaction doctrine should be applied to a given set of facts; however, courts have applied three alternative tests in deciding whether to invoke the step transaction doctrine in a particular situation: the "binding commitment," the "interdependence," and the "end result" tests. Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 198-199 (1989); Penrod v. Commissioner, supra at 1429-1430. * * *

We have considered the step transaction doctrine in transfer (gift and estate) tax cases. See, e.g., Daniels v. Commissioner, T.C. Memo. 1994-591.

Respondent does not explicitly state which of the above three tests he is relying on, although it appears he is arguing that the 'interdependence' test is applicable. In Santa Monica Pictures, we described the interdependence test as follows:

> Under the "interdependence" test, the step transaction doctrine will be invoked where the steps in a series of transactions are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series. * *

* We must determine whether the individual steps had independent significance or whether they had significance only as part of a larger transaction. * * * [Citations omitted.]

In his brief, respondent argues:

If none of the individual events occurring between the contribution of the property to the partnership and the gifts of partnership interests had any significance independent of its status as an intermediate step in the donors' plan to transfer their assets to their donees in partnership form, the formation, funding, and transfer of partnership units pursuant to an integrated plan is treated as a gift of the assets to a partnership of which the donees are the other partners. Treas. Reg. § 25.2511-1(h)(1).

The nub of respondent's argument is that petitioners' formation and funding of the partnership should be treated as occurring simultaneously with their 1999 gift of LP units since the events were interdependent and the separation in time between the first two steps (formation and funding) and the third (the gift) served no purpose other than to avoid making an indirect gift under section 25.2511-1(h), Gift Tax Regs. While we have no doubt that petitioners' purposes in forming the partnership included making gifts of LP units indirectly to the children, we cannot say that the legal relations created by the partnership agreement would have been fruitless had petitioners not also made the 1999 gift. Indeed, respondent does not ask that we consider either the 2000 gift (made approximately 2 months after formation of the partnership) or the 2001 gift (made approximately 15 months after formation of the partnership) to be indirect gifts of Dell shares. We must determine whether the fact that less

than 1 week passed between petitioners' formation and funding of the partnership and the 1999 gift requires a different result.

Respondent relies heavily on the opinion of the Court of Appeals for the Eighth Circuit in Senda v. Commissioner, 433 F.3d 1044 (8th Cir. 2006).[6] In affirming our decision in the Senda case, the Court of Appeals concluded that we did not clearly err in finding that the taxpayers' transfers of shares of stock to two family limited partnerships, coupled with their transfers on the same days of limited partner interests to their children, were in each case integrated steps in a single transaction. Id., at 1049. The taxpayers argued that the order of transfers did not matter since, pursuant to the partnership agreements in question, their contributions of the shares of stock were credited to their partnership capital accounts before being credited to the children's accounts. Id. at 1047. Invoking the step transaction doctrine, the Court of Appeals rejected that step-dependent argument. Id. at 1048. It said: "In some situations, formally distinct steps are considered as an integrated whole, rather than in isolation, so federal tax liability is based on a realistic view of the entire transaction." Id.

This case is distinguishable from Senda because petitioners did not contribute the Dell shares to the partnership on the same day they made the 1999 gift; indeed, almost 1 week passed between

---

[6] The Court of Appeals for the Eighth Circuit is the court to which, barring the parties' stipulation to the contrary, any appeal in this case would lie. See sec. 7482(b).

petitioners' formation and funding of the partnership and the 1999 gift. Nevertheless, the Court of Appeals in Senda did not say that, under the step transaction doctrine, no indirect gift to a partner can occur unless, on the day property is transferred to the partnership, the partner is (or becomes) a member of the partnership. As respondent's failure to argue indirect gifts on account of the 2000 and 2001 gifts suggests, however, the passage of time may be indicative of a change in circumstances that gives independent significance to a partner's transfer of property to a partnership and the subsequent gift of an interest in that partnership to another.

Here the value of an LP unit changed over time. The parties have stipulated the high, low, average, and closing prices of a share of Dell stock on November 2, 1999, the date petitioners initially transferred Dell shares to the partnership's account, and the subsequent dates of the gifts, and we have found accordingly. See supra table 7. Beginning on November 2, 1999, and ending on the dates of the gifts, the percentage changes in the average price of a share of Dell stock were as follow:

### Table 9

#### Percentage Changes in the Average Price of a Share of Dell Stock

| Date | Percentage |
|---|---|
| 11/2/1999 to 11/8/1999 | −1.316 |
| 11/2/1999 to 1/4/2000 | +17.745 |
| 11/2/1999 to 2/2/2001 | −35.748 |

The value of an LP unit, based on its proportional share of the average value of the Dell shares held by the partnership, fell or rose between the dates indicated by the percentage indicated. Respondent has proposed as a finding of fact, and we have found, that, at the time Tom decided to create the partnership, he had plans to make the 1999, 2000, and 2001 gifts. Petitioners bore the risk that the value of an LP unit could change between the time they formed and funded the partnership and the times they chose to transfer LP units to Janelle. Indeed, the absolute value of the rate of change in the value of an LP unit was greater from November 2 to November 8, 1999, than it was from November 2, 1999, to February 2, 2001. Morever, the partnership held only shares of Dell stock on both November 8, 1999 (the date of the 1999 gift), and January 4, 2000 (the date of the 2000 gift), and the partnership agreement was not changed in the interim. Respondent apparently concedes that a 2-month separation is sufficient to give independent significance to the funding of the partnership and a subsequent gift of LP units. We assume that concession to be on account of respondent's recognition of the economic risk of a change in value of the partnership that petitioners bore by delaying the 2000 gift for 2 months. We draw no bright lines. Given, however, that petitioners bore a real economic risk of a change in value of the partnership for the 6 days that separated the transfer of Dell shares to the partnership's account and the date of the 1999 gift, we shall treat the 1999 gift the same way respondent

concedes the 2000 and 2001 gifts are to be treated; i.e., we shall not disregard the passage of time and treat the formation and funding of the partnership and the subsequent gifts as occurring simultaneously under the step transaction doctrine.[7]

D.  Conclusion

The 1999 gift is properly treated as a direct gift of LP units and not as an indirect gift of Dell shares.

III.  Section 2703

A.  Introduction

In pertinent part, section 2703(a) provides that, for purposes of the gift tax, the value of any property transferred by gift is determined without regard to any right or restriction (without distinction, restriction) relating to the property. Paragraphs 9.1, 9.2, and 9.3 of the partnership agreement (paragraphs 9.1, 9.2, and 9.3, respectively), set forth supra, govern the assignment of LP units, and the parties agree that those paragraphs contain restrictions on the right of a limited partner in the partnership (a limited partner) to sell or assign her partnership interest.  Section 2703(b) provides that section

_____

[7]  The real economic risk of a change in value arises from the nature of the Dell stock as a heavily traded, relatively volatile common stock.  We might view the impact of a 6-day hiatus differently in the case of another type of investment; e.g., a preferred stock or a long-term Government bond.

2703(a) does not apply to disregard a restriction if the restriction meets each of the following three requirements:

> (1) It is a bona fide business arrangement.
>
> (2) It is not a device to transfer such property to members of the decedent's family for less than full and adequate consideration in money or money's worth.
>
> (3) Its terms are comparable to similar arrangements entered into by persons in an arm's length transaction.

Because we find that paragraph 9.3 fails at least the first and second restrictions, we shall disregard it in determining the values of the LP units transferred.

B. <u>Bona Fide Business Arrangement</u>

1. <u>Parties' Arguments</u>

Respondent argues that paragraph 9.3 is not part of a bona fide business arrangement since "[c]arrying on a business requires more than holding securities and keeping records." As authority for that proposition, respondent cites an income tax case, <u>Higgins v. Commissioner</u>, 312 U.S. 212 (1941) (taxpayer's managerial activities in connection with collecting interest and dividends on securities held for investment did not amount to carrying on a business for purposes of deducting associated expenses). Besides, respondent adds, Tom's primary purpose in forming the partnership were to preserve his Dell wealth and "disincentivize" the children from spending it, while Kim's primary purpose in forming it was to educate the children about family wealth. Those, respondent argues, "are personal, not

business[,] goals.  Personal goals, with nothing more, do not create a business arrangement."

Petitioners argue:

The restrictions on transferability, the right of first refusal, and the payout mechanism in paragraphs 9.1, 9.2, and 9.3 of the Partnership Agreement serve a bona fide business purpose * * * by preventing interests in the Partnership from passing to non-family members.  * * *  The creation of a mechanism to ensure family ownership and control of a family enterprise has long been held by this Court to constitute a bona fide and valid business purpose.  See Estate of Stone v. Comm'r, 86 T.C.M. (CCH) 551 (2003); Estate of Bischoff v. Comm'r, 69 T.C. 32, 39-41 (1977); Estate of Reynolds v. Comm'r, 55 T.C. 172, 194 (1970), acq., 1971-2 C.B. 1; Estate of Littick v. Comm'r, 31 T.C. 181, 187 (1958), acq., 1984-2 C.B. 1; Estate of Harrison v. Comm'r, 52 T.C.M. (CCH) 1306, 1309 (1987) (holding that "[w]ith respect to business purpose, petitioner presented convincing proof that the partnership was created as a means of providing necessary and proper management of decedent's properties and that the partnership was advantageous to and in the best interests of decedent").

2.  Discussion

Section 2703 contains no definition of the phrase "bona fide business arrangement".  Nevertheless, we have held that the subject of the restrictive agreement need not directly involve an actively managed business.  See, e.g., Estate of Amlie v. Commissioner, T.C. Memo. 2006-76 (citing Estate of Bischoff v. Commissioner, 69 T.C. 32, 40-41 (1977), a pre-section 2073 case in which we found it irrelevant that the restrictive agreements necessary to maintain continuity of management in, and control over, corporations carrying on active businesses were agreements with respect to the ownership of a holding company not actively conducting a trade or business and requiring no management).  In

Estate of Amlie, the asset in question was the decedent's
minority interest in a bank.  Before her death the decedent
voluntarily became the ward of a conservator appointed to oversee
her affairs.  The conservator entered into a series of agreements
that, among other things, fixed the value of the decedent's bank
shares for purposes of satisfying the decedent's obligations to
transfer those shares to a prospective heir both in satisfaction
of promised bequests and by sale upon her death.  The fixed value
was lower than the price obtained by the heir on his resale of
the shares a month after the decedent's death.  The Commissioner
sought to disregard the value-fixing agreements entered into by
the conservator.  We found that, in securing the agreements, the
conservator "was seeking to exercise prudent management of
decedent's assets by mitigating the very salient risks of holding
a minority interest in a closely held bank, consistent with the
conservator's fiduciary obligations to decedent."  We held:

> [A]n agreement that represents a fiduciary's efforts to
> hedge the risk of the ward's holdings may serve a
> business purpose within the meaning of section
> 2703(b)(1).  In addition, planning for future liquidity
> needs of decedent's estate, which was also one of the
> objectives underlying * * * [one of the relevant
> agreements], constitutes a business purpose under
> section 2703(b)(1).  * * *

In reaching that conclusion, we referred to the legislative
history of section 2703, which includes an informal report of the
Senate Committee on Finance, Informal Senate Report on S. 3209,
101st Cong., 2d Sess. (1990), 136 Cong. Rec. 30,488, 30,539
(1990) (the Committee on Finance report).  The Committee on
Finance report observes that buy-sell agreements

> are common business planning arrangements * * * that *
> * *  generally are entered into for legitimate business
> reasons * * * .  Buy-sell agreements are commonly used
> to control the transfer of ownership in a closely held
> business, to avoid expensive appraisals in determining
> purchase price, to prevent the transfer to an unrelated
> party, to provide a market for the equity interest, and
> to allow owners to plan for future liquidity needs in
> advance.  * * *

Indeed, we have held that buy-sell agreements serve a legitimate

purpose in maintaining control of a closely held business.  E.g.,

Estate of Bischoff v. Commissioner, supra; Estate of Reynolds v.

Commissioner, 55 T.C. 172 (1970); Estate of Fiorito v.

Commissioner, 33 T.C. 440 (1959).[8]

Here, however, we do not have a closely held business.  From

its formation through the date of the 2001 gift, the partnership

carried on little activity other than holding shares of Dell

stock.  Dell was not a closely held business either before or

after petitioners contributed their Dell shares to the

partnership.  While we grant that paragraphs 9.1 through 9.3 (and

paragraph 9.3 in particular) aid in control of the transfer of LP

units, the stated purposes of the partnership, viewed in the

light of petitioners' testimony as to their reasons for forming

the partnership and including paragraphs 9.1 through 9.3 in the

partnership agreement, lead us to conclude that those paragraphs

do not serve bona fide business purposes.  Paragraph 3.1 of the

---

[8]  Nevertheless, the existence of a valid business purpose
does not necessarily exclude the possibility that a buy-sell
agreement is a tax-avoidance testamentary device to be
disregarded in valuing the property interest transferred.  St.
Louis County Bank v. United States, 674 F.2d 1207, 1210 (8th Cir.
1982).

partnership agreement includes among the stated purposes of the partnership: "to * * * provide a means for the Family to gain knowledge of, manage, and preserve Family Assets." Tom testified at some length as to his understanding of the term "preservation" and his reasons for making asset preservation a purpose of the partnership. On the basis of that testimony, we find that his reason for making asset preservation a purpose of the partnership was to protect family assets from dissipation by the children. Tom also testified that paragraph 9.1 "lays out pretty strong limitations on what the limited partners can do in assigning or giving away their interests to other people." He viewed the buy-in provisions of paragraph 9.3 as a "safety net" if an impermissible person obtained an assignment of a limited partner interest from one of the girls. He considered the provisions of paragraphs 9.1, 9.2, and 9.3, together, as important in accomplishing his goal of keeping the partnership a closely held partnership of family members: "If there are ways for the family [the children] to wiggle out of that and bring other people in, then it will prevent us from accomplishing our goals, so we wanted a couple of levels here of restriction that would prevent that from happening." Kim testified that the purpose of organizing the partnership was to establish a tool for Tom and her "to be able to teach * * * [the] children about wealth and the responsibility of that wealth."

We believe that paragraphs 9.1 through 9.3 were designed principally to discourage dissipation by the children of the

wealth that Tom and Kim had transferred to them by way of the gifts.  The meaning of the term "bona fide business arrangement" in section 2703(b)(1) is not self apparent.  As discussed supra, in Estate of Amlie v. Commissioner, T.C. Memo. 2006-76, we interpreted the term "bona fide business arrangement" to encompass value-fixing arrangements made by a conservator seeking to exercise prudent management of his ward's minority stock investment in a bank consistent with his fiduciary obligations to the ward and to provide for the expected liquidity needs of her estate.  Those are not the purposes of paragraphs 9.1 through 9.3.  There was no closely held business here to protect, nor are the reasons set forth in the Committee on Finance report as justifying buy-sell agreements consistent with petitioners' goals of educating their children as to wealth management and "disincentivizing" them from getting rid of Dell shares, spending the wealth represented by the Dell shares, or feeling entitled to the Dell shares.

### 3. Conclusion

We find that paragraphs 9.1 through 9.3 do not serve bona fide business purposes.  Those paragraphs do not constitute a bona fide business arrangement within the meaning of section 2703(b)(1).

### C. Device Test

The second requirement of section 2703(b) is that the restriction not be a device to transfer the encumbered property to members of the decedent's family for less than full and

adequate consideration in money or money's worth (hereafter, simply adequate consideration). Sec. 2703(b)(2). The Secretary's regulations interpreting section 2703 substitute the term "the natural objects of the transferor's bounty" for the term "members of the decedent's family", apparently because he interprets section 2703 to apply to both transfers at death and inter vivos transfers. Sec. 25.2703-1(b)(1)(ii), Gift Tax Regs.[9] Clearly, the gifts of the LP units were both (1) to natural objects of petitioners' bounty and (2) for less than adequate consideration. They were not, however, a "device" to transfer the LP units to the children for less than adequate consideration. The question we must answer is whether paragraphs 9.1 through 9.3, which restrict the children's rights to enjoy the LP units, constitute such a device. We believe that they do. Those paragraphs serve the purposes of Tom and Kim to discourage the children from dissipating the wealth that Tom and Kim had transferred to them by way of the gifts. They discourage dissipation by depriving a child desirous of making an impermissible transfer of the ability to realize the difference in value between the fair market value of his LP units and the units' proportionate share of the partnership's NAV. If a child persists in making an impermissible transfer, paragraph 9.3

_____

[9] Petitioners argue: "Of course, there is no decedent in this case, so § 2703(b)(2) appears to be satisfied on its face." They fail, however, to challenge the validity of sec. 25.2703-1(b)(1)(ii), Gift Tax Regs., upon which respondent relies. We assume that they concede the validity of the regulation in applying the device test to transfers to "the natural objects of the transferor's bounty".

allows the general partners (currently Tom and Kim) to redistribute that difference among the remaining partners. Thus, if the provisions of paragraph 9.3 are triggered and the partnership redeems the interest of an impermissible transferee for less than the share of the partnership's net asset value proportionate to the impermissible transferee's interest in the partnership (which is likely, given the agreement of the parties' valuation experts as to how the valuation discounts appropriate to an LP unit are applied; see infra section IV.A. of this report), the values of the remaining partners' interests in the partnership will increase on account of that redemption. See infra note 17 and the accompanying paragraph. The partners benefiting from the redemption could (indeed, almost certainly, would) include one or more of the children, natural objects of petitioners' bounty.

Tom participated in the drafting of the partnership agreement to ensure, in part, that "asset preservation" as he understood that term (i.e., to discourage the children from dissipating their wealth) was addressed. Tom impressed us with his intelligence and understanding of the partnership agreement, and we have no doubt that he understood the redistributive nature of paragraph 9.3. and his and Kim's authority as general partners to redistribute wealth from a child pursuing an impermissible transfer to his other children. We assume, and find, that he intended paragraph 9.3 to operate in that manner, and this intention leads us to conclude, and find, that paragraph 9.3 is a

device to transfer LP units to the natural objects of petitioners' bounty for less than adequate consideration.

D.  Comparable Terms

The third requirement of section 2703(b) is that the terms of the restriction be comparable to similar arrangements entered into by persons in an arm's-length transaction.  Comparability is determined at the time the restriction is created.  Sec. 25.2703-1(b)(1)(iii), Gift Tax Regs.  The parties rely on expert testimony to show that the elements of section 2703(b)(3) have or have not been satisfied.

Respondent called Daniel S. Kleinberger, professor of law at William Mitchell College of Law, St. Paul, Minnesota.  Professor Kleinberger was accepted as an expert on arm's-length limited partnerships.  In his direct testimony, he expressed the opinion that the overall circumstances of the partnership arrangement made it unlikely that a person in an arm's-length arrangement with the general partners would accept any of the "salient" restrictions on sale or use contained in the partnership agreement.  He explained:

> In virtually every material respect, the * * * [partnership] agreement blocks for 50 years the limited partners' ability to sell or use their respective limited partner interests.  In an arm's length transaction, a reasonable investor faced with such a prospect would ask, "What is so special about this opportunity, what do I get out of this arrangement that justified so restricting and enfeebling my rights?"  The answer, in an arm's length context, is nothing.

On cross-examination, he agreed with counsel for petitioners that transfer restrictions similar to those found in paragraphs

9.1 through 9.3 are common in agreements entered into at arm's length. That, however, he concluded, was beside the point since "The owners of a closely held business at arm's length would never get into this deal with the Holmans, period, so the issue [transfer restrictions] wouldn't come up." In response to petitioner's counsel's expression of doubt as to what he meant, he answered:

> What I mean is that when you look at the overall context, when you look at the nature of the assets, when you look at the expertise or non-expertise of the general partner, when you look at the 50-year term, when you look at the inability to get out, when you look at the susceptibility of this single asset, * * * the issue [transfer restrictions] wouldn't arise, because nobody at arm's length would get into this deal."

Using a colorful expression, he summed up his view as follows:

> [B]ased on my experience and based on conversations with more than a dozen practitioners who do this stuff, I couldn't find anybody would do this deal, who would let their client into a deal like this as a limited partner without writing a very large CYA memo, saying: "We advise against this."

Petitioners called William D. Klein (Mr. Klein), a shareholder in the Minnesota law firm of Gray, Plant, Mooty, Mooty & Bennett, P.A. Mr. Klein has "practiced, written, and lectured about" partnership taxation and law for more than 20 years. He has participated in the drafting of, or reviewed drafts of, more than 300 limited partnership agreements. He was accepted as an expert with respect to the comparability of the provisions of the partnership agreement to provisions in other partnership agreements entered into by parties at arm's length. He was asked by petitioners to express his opinion as to whether

various provisions of the partnership agreement are "'comparable to similar arrangements entered into by persons in an arm's length transaction'".  With respect to paragraphs 9.1 and 9.2, Mr. Klein is of the opinion that the paragraphs "are comparable to provisions one most often finds in limited partnership agreements among unrelated partners."  As to paragraph 9.3, he is of the opinion that the paragraph "is not out of the mainstream of what one typically finds in arm's length limited partnership agreements."

Petitioners must show that paragraph 9.3 is "comparable to similar arrangements entered into by persons in an arm's length transaction."  See sec. 2703(b)(3).  The experts agree that transfer restrictions comparable to those found in paragraphs 9.1 through 9.3 are common in agreements entered into at arm's length.  That would seem to be all that petitioners need to show to satisfy section 2703(b)(3).  Nevertheless, respondent relies on one of his expert's, Professor Kleinberger's, testimony "that the overall circumstances of the * * * [partnership] arrangement make it unlikely that arm's length third parties would agree to any one of its restrictions on sale or use."  Even were we to find that paragraph 9.3 is comparable to similar arrangements entered into by persons in arm's-length transactions (thus satisfying section 2703(b)(3)), we would still disregard it because it fails to constitute a bona fide business arrangement, as required by section 2703(b)(1), and is a prohibited device within the meaning of section 2703(b)(2).  Therefore, we need not

(and do not) decide today whether respondent is correct in applying the arm's-length standard found in section 2703(b)(3) to the transaction as a whole.

IV. Valuation

A. Introduction

We must determine the values of the gifts. Although the gifts were of LP units, the parties agree that the starting point for determining those values is the net asset value (NAV) of the partnership. Since, on the dates of the gifts, the partnership held only shares of Dell stock and had no liabilities, the parties agree that the NAV on each of those dates equals the value of the Dell shares then held. The parties also agree that, in valuing the gifts of LP units, we are to look to the pro rata portion of the NAV of the partnership allocable to the LP units transferred but are to make negative adjustments to the values so determined to reflect the lack of control and lack of marketability inherent in the transferred interests. The parties disagree on the magnitude of those discounts. They also disagree on the effect of disregarding paragraph 9.3. We have set forth as appendixes A through D hereto comparisons based on materials prepared by respondent of the parties' valuation positions for each of the gifts. There appear to be no discrepancies between the information in those appendixes and petitioners' computations of like amounts.

B.  Law

Pertinent to our determination of the values of the gifts is section 25.2512-1, Gift Tax Regs., which provides that the value of property for Federal gift tax purposes is "the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts." The willing buyer and willing seller are hypothetical persons, rather than specific individuals or entities, and their characteristics are not necessarily the same as those of the donor and the donee.  See, e.g., Estate of Davis v. Commissioner, 110 T.C. 530, 535 (1998).  The hypothetical willing buyer and the hypothetical willing seller are presumed to be dedicated to achieving the maximum economic advantage.  E.g., id.

C.  Expert Opinions

1.  Introduction

The parties rely exclusively on expert testimony to establish the appropriate discounts to be applied in determining the fair market values of the gifts of LP units.  Of course, we are not bound by the opinion of any expert witness, and we may accept or reject expert testimony in the exercise of our sound judgment.  Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990).  Because valuation necessarily involves an approximation, the figure at which we arrive need not be directly traceable to specific testimony if it is within the range of values that may

be properly derived from consideration of all the evidence. E.g., <u>Peracchio v. Commissioner</u>, T.C. Memo. 2003-280.

## 2. Petitioners' Expert

Petitioners called Troy D. Ingham (Mr. Ingham) as an expert witness to testify concerning the values of the gifts. Mr. Ingham is a vice president and director with Management Planning, Inc., a business valuation firm. He has been performing valuation services since 1996. He is a candidate for the American Society of Appraisers. The Court accepted Mr. Ingham as an expert on business valuation and limited partnership valuation, and we received into evidence as his direct testimony four reports he had participated in preparing. Three of those reports express his opinions as to the fair market value of an LP unit on November 8, 1999, January 4, 2000, and February 2, 2001, respectively (the dates of the 1999, 2000, and 2001 gifts, respectively). In each report, Mr. Ingham gives his opinion alternatively regarding and disregarding the effect of paragraph 9.3. Mr. Ingham's opinions are summarized in appendixes A through D. Petitioners offered Mr. Ingham's fourth report in rebuttal to respondent's valuation expert witness's testimony, and that report expresses Mr. Ingham's opinion that some of respondent's valuation expert witness's conclusions are flawed.

## 3. Respondent's Expert

Respondent called Francis X. Burns (Mr. Burns) as an expert witness to testify concerning the values of the gifts. Mr. Burns is a vice president of CRA International, Inc., an international

consulting firm that provides business valuation services. He is an accredited senior appraiser in business valuation within the American Society of Appraisers and a member of the Institute of Business Appraisers. He has been performing valuation services for more than 18 years, and he has testified as an expert in several valuation cases. The Court accepted Mr. Burns as an expert in the valuation of business entities and partnerships, and we received into evidence as his direct testimony the report he had prepared. In that report, he expresses his conclusions as to the fair market values of the gifts, alternatively regarding and disregarding the effect of paragraph 9.3. His opinions are summarized in appendixes A through D.

D. Discussion

1. Net Asset Value of Partnership

The parties agree on the numbers of Dell shares the partnership held on the dates of the gifts. They further agree that the value of those shares establishes the NAV of the partnership on each of those dates. They agree that the partnership's NAV was $2,812,763 (rounded) on the date of the 1999 gift. They disagree as to the partnership's NAV on each of the dates of the 2000 and 2001 gifts. Relying on Mr. Ingham's calculation of the closing values of a share of Dell stock on the dates of those gifts, petitioners argue that the partnership's NAVs on those dates were $4,672,758 and $2,798,331, respectively. Relying on Mr. Burns's calculations of the averages of the high and low prices of a share of Dell stock on those dates,

respondent argues that the partnership's NAVs on those dates were $4,798,033 and $2,902,488, respectively. Section 25.2512-2, Gift Tax Regs., deals with the valuation of stocks and bonds for purposes of the gift tax. See sec. 25.2512-2(a), Gift Tax Regs. In pertinent part, section 25.2512-2(b)(1), Gift Tax Regs., provides: "In general, if there is a market for stocks * * *, on a stock exchange, in an over-the-counter market or otherwise, the mean between the highest and lowest quoted selling prices on the date of the gift is the fair market value per share". Petitioners argue that, because the gifts here being valued are gifts of partnership interests that do not trade in a public market, the regulation is inapplicable. Moreover, argue petitioners, in determining his discount for lack of control, Mr. Ingham relied on data showing that shares of publicly held investment companies generally trade at a discount from NAV, determined by comparing the price of the company to its end-of-day NAV.

We cannot dismiss the regulation, as petitioners would have us do. The starting point for valuing the gifts is determining the NAV of the partnership, which is defined exclusively by the value of shares of Dell stock, which Mr. Ingham opines are "traded over-the-counter". The rules for valuing marketable shares of stock found in section 25.2512-2(b)(1), Gift Tax Regs., are not gift-specific rules whose application makes no sense if it is only the value of the shares, indirectly, that is at issue, and petitioners provide no authority for disregarding the rules.

To the contrary, petitioners cite a case that supports a contrary view: Estate of Cook v. Commissioner, T.C. Memo. 2001-170 (annuity tables appropriate to value installment payoff of lottery ticket held by partnership notwithstanding marketability discount that might apply to valuation of partnership interest), affd. 349 F.3d 850 (5th Cir. 2003).

Petitioners' argument with respect to Mr. Ingham's methodology for determining a lack of control discount is equally unpersuasive. Data from the universe of trades of publicly held investment companies may well show that shares of those companies generally trade at a discount from NAV determined at the end of the day, but petitioners have failed to show that any statistical inference to be drawn from that data would be any different if an average of the highs and lows of the component securities were used to determine NAV.

We shall rely on Mr. Burns's computations of $4,798,033 and $2,902,488 as the partnership's NAVs on the dates of the 2000 and 2001 gifts, respectively.

2. Minority Interest (Lack of Control) Discount

a. Introduction

Pursuant to the partnership agreement, a hypothetical buyer of an LP unit would have limited control of his investment. For instance, such a buyer (1) would have no say in the partnership's investment strategy, and (2) could not unilaterally recoup his investment by forcing the partnership either to redeem his unit or to undergo a complete liquidation. The parties agree that the

hypothetical "willing buyer" of an LP unit would account for such lack of control by demanding a reduced price; i.e., a price that is less than the unit's pro rata share of the partnership's NAV.

b.    Comparison to Closed-End Investment Funds

Both Messrs. Ingham and Burns apply minority interest discounts in valuing the gifts by reference to the prices of shares of publicly traded, closed-end investment funds, which typically trade at a discount relative to their share of fund NAV by definition.[10]   The idea is that since, by definition, such shares enjoy a high degree of marketability, those discounts must be attributable, at least to some extent, to a minority shareholder's lack of control over the investment fund.  The minority interest discounts applied by Messrs. Ingham and Burns in valuing the gifts are as follows:

Table 10

| Valuation expert | 1999 gift | 2000 gift | 2001 gift |
| --- | --- | --- | --- |
| Mr. Ingham | 14.4% | 16.3% | 10% |
| Mr. Burns | 11.2 | 13.4 | 5 |

In determining those discounts, both experts rely on samples of closed-end investment funds with investment portfolios comprising predominantly domestic equity securities; viz, shares

---

[10]   We understand from the expert testimony of Messrs. Ingham and Burns that, unlike a shareholder of an open-end fund (and similar to a holder of a limited partner interest in the partnership), a shareholder of a closed-end fund cannot obtain the liquidation value of his investment (i.e., his pro rata share of the fund's net asset value (NAV)) at will by tendering his shares to the fund for repurchase.

of common stock.  Each expert relies on three samples, one for the date of each gift (the valuation dates).  Mr. Ingham's sample sizes are 28, 28, and 27, and Mr. Burns's are 28, 27, and 25. For the first two valuation dates, 20 of the closed-end investment funds in each of the four sets of samples are the same.  For the third date, 18 are the same.  Mr. Burns relies solely on general equity funds, which contain a diversified portfolio of stocks across industries.  Mr. Ingham includes in his samples seven specialized equity funds with investments in the healthcare, petroleum and resources, and banking industries. Mr. Ingham computes (and relies on) only the median discount for each of his samples.  Mr. Burns computes not only the median discount for each of his samples but also the mean and interquartile mean discounts for each.[11]  The following table shows the results of each expert's computations.

---

[11]  The following description of the terms "mean", "median", and "interquartile mean" is drawn from Kaye & Freedman, "Reference Guide on Statistics", in Reference Manual on Scientific Evidence, 83, 113–115 (Federal Judicial Center, 2d ed. 2000).  "Mean" and "median" are common descriptive statistics used to describe the central tendency (i.e., the middle or "expected" value) of a set of numerical data.  The mean (commonly, "average") is found by adding up all the numbers and dividing by how many there are.  By comparison, the median is defined so that half the numbers are bigger than the median, and half are smaller.  The mean takes account of all the data – it involves the total of all the numbers.  Particularly with small data sets, however, a few unusually large or small observations may have too much influence on the mean.  The median is resistant to such outliers.  See the definition of the term "outlier" infra note 12.  The interquartile mean is the mean of the 50 percent of the data points falling between the 25th and 75th percentiles. Like the median, it is resistant to outliers.  Also, to remove the influence of outliers on the mean, it may be recomputed disregarding outliers.

Table 11

| Valuation expert's computation | 1999 gift | 2000 gift | 2001 gift |
| --- | --- | --- | --- |
| Mr. Ingham: Median | 13.1% | 14.8% | 9.1% |
| Mr. Burns: Mean | 10.8 | 11.7 | 3.4 |
| Mr. Burns: Median | 12.1 | 14.8 | 3.8 |
| Mr. Burns: Interquartile mean | 11.2 | 13.4 | 5.0 |

Mr. Ingham considers adjustments to his median discount figures to reflect what he describes as quantitative factors (i.e., aggregate size of the partnership's NAV, relative volatility of the partnership's portfolio, measures of return and yield) but determines that those factors had an insignificant influence. He considers qualitative factors (i.e., the lack of diversification of the partnership's portfolio, the depth and quality of the partnership's management, the partnership's income tax status), and he determines that, "[b]ased on all relevant factors, including the fact that * * * [the partnership's] portfolio is neither well diversified nor professionally managed on a daily basis", an investor or willing buyer of an LP unit would require a discount 10 percent greater than the median discount he had determined. Table 10 reflects his final determination that the appropriate minority interest discounts are 110 percent of the median discounts he determined. Mr. Burns relies on the interquartile mean discount. Although he considers a downward adjustment to reflect the large size of the limited partner interest held by Janelle as trustee (and the influence that would

give her over the general partners), he rejects any adjustment "as a point of conservatism".

We must determine (1) the composition of the appropriate samples of closed-end investment funds (i.e., whether Mr. Ingham appropriately includes specialized funds); (2) the appropriate descriptive statistic to measure the central tendency of the samples; and (3) whether Mr. Ingham's adjustments to his sample medians are justified.

### c. Discussion

On cross-examination, Mr. Ingham agreed with counsel for respondent that the seven specialized equity funds that he had included in his samples of closed-end equity funds resembled the partnership only in that they were specialized in their investments. Indeed, that was his reason for including them, although he agreed that he could find no correlation between quantitative factors particular to the funds in his samples and the discounts at which those funds traded. He further agreed that he had included no explanation in his report as to why he had included the specialized funds in his samples. We have examined the data Mr. Ingham presented with respect to discounts from NAV for the seven specialized funds for the first valuation date (November 8, 1999) and have determined that the discounts for that subset of his sample range from a minimum of 9.8 percent to a maximum of 24.9 percent, with mean and median discounts of 17.1 and 17.8 percent, respectively, as compared to the range of discounts for the full sample, 1 to 24.9 percent, with mean and

median discounts of 12 and 13 percent, respectively.  Both experts agree that general equity funds are sufficiently comparable to the partnership so that useful information as to an appropriate minority discount can be drawn from a sample of those funds.  They disagree as to whether useful information can be obtained by considering funds specializing in industries different from Dell's computer business.  Mr. Burns believes that it cannot.  Given that disagreement and the significant differences we found in comparing the range, mean, and median of the subset and the sample, we are content to rely on the area of the experts' agreement; i.e., that a sample of general equity funds is reliable for purposes of determining an appropriate minority discount.  We shall construct samples for each valuation date from the intersection of the experts' data sets for that date (i.e., the 20 funds selected for both the first and second valuation dates and the 18 funds selected for the third valuation date).

Mr. Ingham dealt with his concern for outliers[12] by relying on the median of each sample.  He is of the opinion that the median does not put any weight on outliers as the mean would.  In response to the Court's question as to whether he relied on the median because outliers caused a significant difference between the means and the medians in his samples, he answered that he did

---

[12]  Outlier:  "An observation that is far removed from the bulk of the data.  Outliers may indicate faulty measurements and they may exert undue influence on summary statistics, such as the mean * * *."  Kaye & Freedman, supra at 168.

not know since he had not computed the mean.  Mr. Burns computed the mean, the median, and the interquartile mean for each of his samples.  His approach to the problem of outliers appears to have been more thoughtful than Mr. Ingham's, and we shall follow his lead and deal with the problem of outliers by relying on the interquartile mean of each sample we construct.

We shall also follow Mr. Burns's lead and make no adjustments to the averages so obtained.  Simply put, Mr. Ingham has failed to convince us that lack of portfolio diversity and professional management justify an increased adjustment on account of lack of control of 10 percent (or, indeed, any adjustment at all).  In his report, Mr. Ingham concedes:  "the Partnership's relatively simple investment portfolio negates [lack of professional management]".  Nor can we see how lack of diversity could exacerbate lack of control since the partnership was, on the valuation dates, transparently, the vehicle for holding shares of stock of a single, well-known corporation.  Mr. Ingham's 10-percent adjustment, based on "all relevant factors", is without sufficient analytical support to convince us that any adjustment should be made to the sample averages we obtain.  See Casey v. Commissioner, 38 T.C. 357, 381 (1962) ("An expert's opinion is entitled to substantial weight only if it is supported by the facts.").

d.  Conclusion

We determine minority interest discounts to be applied in valuing the gifts as follows:

Table 12

| 1999 gift | 2000 gift | 2001 gift |
|-----------|-----------|-----------|
| 11.32%    | 14.34%    | 4.63%     |

3.  Marketability Discount

a.  Introduction

The parties agree that, to reflect the lack of a ready market for LP units (or, more pertinently, assignee interests in the partnership), an additional discount (after applying the minority interest discounts) should be applied to the partnership's NAV to determine the fair market values of the gifts.  Such a discount is commonly referred to as marketability discount.  The experts differ sharply on two points:  (1) The existence of a market for LP units, and (2) the weight that should be given various qualitative factors.

b.  Mr. Ingham's Opinion

To determine an appropriate marketability discount, Mr. Ingham looks at his and others' studies of restricted stock transactions, which compare the private-market price of restricted shares of public companies (i.e., shares that, because they have not been registered with the Securities and Exchange Commission (SEC), generally cannot be sold in the public market

for a 2-year period)[13] with their coeval public market price.
Mr. Ingham combines data from the restricted stock approach with
his analysis of the "investment quality" of the LP units to
support a marketability discount of 35 percent.

### c. Mr. Burns's Opinion

Mr. Burns's approach requires more explanation.  He also
considers various studies of marketability discounts with respect
to restricted stock sales.  He looks at studies of the mean
discount (in two cases, the median discount) on sales of
restricted stock during three periods:  (1) before 1990; (2) from
1990 to 1997; and (3) during 1997 and 1998.  In 1972, the SEC
adopted rule 144, 17 C.F.R. sec. 230.144 (1972), imposing a 2-
year holding period on the resale of restricted stock.  In 1990,
the SEC adopted rule 144A, 17 C.F.R. sec. 230.144A (1990),
allowing institutional buyers to buy and sell restricted stock.
In 1997, the SEC amended rule 144, 17 C.F.R. sec. 230.144 (1997),
reducing the required holding period to 1 year.  For the first
period (pre-1990), which Mr. Burns characterizes as "lack[ing] *
* * a resale market", the average of the discounts for the
studies he considered is 34 percent.  For the second period (1990
to 1997), the similar average is 22 percent, and, for the third
period (1997 and 1998), it is 13 percent.  He concludes:

> Based on the evolution of restricted stock discounts,
> there appear to be at least two factors that influence
> investors:  1) the limited access to a liquid market

---

[13]  See 17 C.F.R. sec. 230.144(d) (1972).  The required
holding period was shortened to 1 year in 1997.  See 62 Fed. Reg.
9242 (Feb. 28, 1997).

and 2) the required holding period before the restricted stock can be freely traded.  These factors suggest an explanation as to why average marketability discounts have decreased since the implementation of Rule 144A and the Amendment to Rule 144A [sic., Rule 144].  Rule 144A allowed for institutional trading of restricted stocks.  The difference between average marketability discounts before and after Rule 144A would appear to reflect the discount investors required for having virtually no secondary market.  In contrast, the difference between average discounts found prior to and after 1997 is a logical result of the reduction in holding period from two years to one year.

Mr. Burns recognizes that the partnership is very different from the operating companies that are the subject of the restricted stock studies he examined.  Nevertheless, he thinks that the changes in restricted stock discounts over time evidenced by those studies are instructive with respect to the pricing decisions of investors holding securities that cannot readily be resold.  He starts with the premise that, before SEC rule 144A, holders of restricted stock had virtually no access to any secondary (resale) market and, therefore, demanded a discount (34 percent being the average of the studies he examined) to account for that lack of market access.  The promulgation of SEC rule 144A, he argues, opened a resale market (albeit a limited one), and the average discount of the studies he examined for the period from 1990 to 1997 is, at 22 percent, 12 percentage points lower than the average discount he observed for the prior period, before the promulgation of rule 144A.  He concludes that the difference is due to the availability of a resale market after 1990.  Put another way,  Mr. Burns believes that 12 percent is indicative of the charge that the buyer imposed on the seller of

restricted stock before 1990 to account for the buyer's lack of access to a ready resale market.  Mr. Burns concludes that the remaining 22 percentage points of the average pre-1990 discount of 34 percent are attributable to holding period restrictions and factors unrelated to marketability.  He explains the effect of holding period restrictions as follows:  "Legally mandated holding periods can be particularly onerous for investors when the restricted shares are subject to extreme price volatility, as is the case with many financially distressed companies."  He concludes:

> For investment holding companies such as the Partnership -- those not hindered by legal holding periods, nor subject to the operating and financial risks of typical restricted shares -- the measure of discount based on restricted stock research suggests a lack of marketability adjustment closer to 12 percent.

That, he explains "is the incremental level of discounts that investors demanded before 1990, when the trading market became more liquid."

Mr. Burns next turns his attention to the circumstances of the partnership.  He believes that there are factors particular to the partnership that must be considered in determining an appropriate marketability discount.  Mr. Burns lists the following factors:  the failure to make distributions, a nondiversified portfolio, the restrictions on transferring LP units, the dissolution provisions of the partnership agreement, and the liquidity of Dell shares.  He considers the last two factors as increasing marketability.  He believes that the provisions of the partnership agreement providing for the

voluntary dissolution of the partnership (and distribution of its assets on a pro rata basis to its partners) would benefit a limited partner wishing to sell her interest. He believes that a voluntary dissolution of the partnership would be of little detriment to the remaining partners, who could reconstitute the partnership less the withdrawing partner (who might agree to pay the costs attendant to dissolution and reconstitution), and the dissolution would significantly benefit the withdrawing partner, who would save the large discount to her proportional share of the partnership's NAV attendant to any assignment of her interest. He notes that, on each valuation date, the partnership's portfolio consisted of only highly liquid, marketable securities; viz, Dell shares: "These assets have an easily discernible value and can be sold quickly and easily."[14] Mr. Burns concludes that a reasonable negotiation between a buyer and seller over the price of a limited partner interest in the partnership would result in a price concession for lack of marketability in the range of 10 to 15 percent. He starts with the notion that traditional studies of unregistered shares of public companies suggest a price concession of 12 percent due to the lack of a ready market. Because of his belief that, unlike restricted stock, a limited partner interest in the partnership is not burdened by prescribed holding period limitations on

---

[14] He adds: "The Partnership owns a substantial block of Dell stock. However, these shares represented less than 0.28% of Dell's trading volume on the dates of valuation, which suggests that the Partnership's shares could be readily absorbed by the market."

resale, nor does it carry the business or financial risk associated with the typical issuer of private placement shares, he adds little for those factors.  He settles on a marketability discount of 12.5 percent.

d. Discussion

(1) Introduction

The experts agree on the usefulness of restricted stock studies in determining appropriate marketability discount for the gifts.  They further agree that (1) no secondary market exists for LP units; (2) an LP unit cannot be marketed to the public or sold on a public exchange; and (3) an LP unit can be sold only in a private transaction.  They disagree principally on the likelihood of a private market among the partners for LP units.

(2) Mr. Ingham's Opinion

Mr. Ingham's approach is relatively straightforward.  He believes that "restricted shares [of publicly held companies] sell at a price below their publicly traded (unrestricted) counterparts because of the lack of access to a ready market due to SEC Rule 144."  He has sampled private transactions in the common stocks of actively traded companies.  His sample shows median and mean discounts of 24.8 and 27.4 percent, respectively, "for equities with access to public stock market liquidity in about two years."  He believes that "these private placement transactions * * * are an appropriate starting point from which to measure the diminution in valuing arising from lack of marketability."  He adds:  "The * * * [marketability] discounts

demanded by potential investors in privately held business interests with potentially very long holding periods should be much larger [than for restricted shares with access to a ready market in 2 years]."  In particular, with respect to the partnership, he concludes that (1) the willing buyer of a limited partner interest "has no real prospects of being able to sell the interest in the public market at the full, freely traded value at any time," and (2) "there is virtually no ready market for * * * [interests in the partnership]".  He appears to dismiss altogether the possibility of a private sale of LP units:

> Further, there is no market for a limited partnership unit in * * * [the partnership].  There have never been any purchases or sales of * * * [partnership] limited partnership units.  Sales of partnership units are restricted by the Agreement.  A buyer has no assurance, as well, of being admitted as a substitute partner, as such admission requires the consent of all the partners.

He concludes:  "Considering all relevant factors, * * * [I] believe that the discount for lack of marketability should be <u>at least</u> 35%."  (Emphasis added.)  He settles for a 35-percent discount for lack of marketability in determining the value of an LP unit.

Respondent observes about Mr. Ingham's analysis:  If Mr. Ingham's assumptions about the absence of a market for LP units are accepted, "then the conclusion is unavoidable that the value of limited partnership interests in the * * * [partnership] is virtually zero, or that they cannot be valued at all." Respondent criticizes Mr. Ingham for being arbitrary in stopping at 35 percent when his analysis would seem to lead to the

conclusion that, since he believes that an LP unit cannot be sold, the appropriate discount for lack of marketability should be 100 percent. Respondent has a point. Mr. Ingham's analysis is predicated on the assumption that he can extrapolate the marketability discount appropriate to an LP unit from the typical discount found by him with respect to a sample of sales of restricted stock barred from resale in a ready market for 2 years. The obstacle he must overcome is his belief that there is not now, nor will there ever be, a ready market (indeed, any market) for LP units. If we are to assume (as he would have us do) that the size of the marketability discount is a function of the length of time that a holder of an interest in a business is barred access to a ready market, then Mr. Ingham has not persuaded us that his stopping point, 35 percent, is anything but a guess. He does not build from his observed sample median and mean discounts of 24.8 and 27.4 percent, respectively, to his 35 percent conclusion by quantitative means. He considers the "investment quality" of the LP units, concluding that the lack of public information about the partnership is a detriment that is mitigated "somewhat" by the transparency of the partnership (since its only assets are shares of Dell stock). He takes into account that there is no market for LP units, and an investor wishing to acquire Dell shares could do so outside of the partnership without encountering the various restrictions attaching to a partnership interest. Without any further analysis, he concludes, as stated supra: "Considering all

relevant factors, * * * the discount for lack of marketability should be at least 35 percent."[15]  Given his assumptions that (1) there is virtually no ready market for LP units, and (2) the size of any marketability discount is a function of the length of time that a holder of an interest in a business is barred access to a ready market, it would seem that he could only draw the conclusion that an LP interest is simply not salable, which is not the conclusion that he draws.  We do not reject per se Mr. Ingham's reliance on restricted stock studies.  We simply lack confidence in the result he reaches given the assumptions he makes.  We need not rely on the unsupported opinion of an expert witness.  See Casey v. Commissioner, 38 T.C. at 381.

(3)  Mr. Burns's Opinion

Mr. Burns looks at the marketability discount as comprising principally two components:  a market access (liquidity) component and a holding period component.  We assume that petitioner's expert, Mr. Ingham, accepts that division since, in his rebuttal report, he states:  "[Mr. Burns] concluded, correctly, that private placement discounts have declined because of relaxations for institutional trading and reductions in

_____

[15]  A clue to his settling on 35 percent may be contained in a reference in his direct testimony to a group of 13 restricted stock studies, which he describes as having a range of observed discounts from 13 to 45 percent and "an observed clustering of discounts between 30% and 35%."  We have computed the group's mean and median discounts to be 29.36 and 31.9 percent, respectively.  The data set is skewed to the left (with more extreme measurements among the lower percentages), which indicates that the median is the preferred measure of central tendency.  Mr. Ingham does not explain what further significance he attaches to his clustering observation.

required holding periods under Rule 144." (Emphasis added.) Mr. Burns pegs at 12 percent the difference in private placement discounts between a period in which holders of restricted stock had no access to a ready market and could only dispose of their restricted stock in private transactions and a period in which certain holders of restricted stock were allowed limited access to a ready market.[16] He concludes: "[That] difference * * * would appear to reflect the discount investors required for having virtually no secondary market." That difference suggests to Mr. Burns the market access component of the marketability discount appropriate to an LP unit; i.e., the price concession that a buyer of an LP unit would demand to reflect that the unit could only be liquidated in a private transaction.

Mr. Burns recognizes that factors particular to the partnership (such as the restrictions on transferring LP units) might elicit an additional discount, and, on the basis of those factors and the discounts suggested by his empirical research studies, he settles on a marketability discount of 12.5 percent. He makes little, if any, adjustment on account of holding period restrictions. He notes that the partners can agree to dissolve the partnership; and, although he did not determine the likelihood of a dissolution, he testified that, so long as the

---

[16] In his rebuttal testimony, Mr. Ingham criticizes Mr. Burns for referring in a portion of his testimony to a reduction in "average marketability discounts" rather than a reduction in private placement discounts. It is clear to us that Mr. Burns is referring to the average of his summary of marketability discount studies based on restricted stock sales. We see no ambiguity or error.

partnership continued to hold only shares of Dell stock (which he characterizes as having "an easily discernible value"), "[he could not] envision an economic reason why * * * [the partnership] would not be willing to let somebody be bought out, because * * * [the remaining partners would] be holding the same proportion of assets, the same type of assets, after * * * [the buyout]." Indeed, given the significant minority interest and marketability discounts from an LP unit's proportional share of the partnership's NAV that each expert would apply in valuing the gifts, it would appear to be in the economic interest of both any limited partner not under the economic necessity to do so but wishing to make an impermissible assignment of LP units and the remaining partners to strike a deal at some price between the discounted value of the units and the dollar value of the units' proportional share of the partnership's NAV. The wishing-to-assign partner would get more than she would get in the admittedly "thin" market for private transactions, and the dollar value of each remaining partner's share of the partnership's NAV would increase.[17] So long as the partnership's assets remain

_____

[17] Thus, for instance, assume that a hypothetical limited partnership organized under an agreement identical to the partnership's has one general and four limited partners, all sharing equally in profits and losses, an NAV of $100, and, because of minority interest and marketability discounts, no impermissible assignment of a limited partner interest could be made for a price greater than 60 percent of the interest's share of NAV. If a limited partner with bargaining power and wishing to dispose of her 20-percent interest and the limited partnership were to settle on a redemption price of $14 for her interest, she would receive $2 more than she could receive on an impermissible assignment, the limited partnership's remaining NAV would be $86,

(continued...)

highly liquid (as they were on each of the valuation dates), the remaining partners would appear to bear little or no economic risk in agreeing to a redemption or similar transaction to accommodate a wishing-to-assign partner.

A transaction of the type described would (if petitioners' proposed discounts are to be credited) increase the wealth of the family members post hoc.  While such a transaction is perhaps inconsistent with the stated purpose of the partnership to "preserve Family assets", the provision in the partnership agreement allowing for the consensual dissolution of the partnership convinces us that preservation of family assets is not an unyielding purpose.  We think that Mr. Burns was correct to take into account the prospect of such a dissolution of the partnership as a significant factor in the private market for LP units, and we think that the economic self-interest of the partnership (more precisely, any remaining partners) must be considered in determining any marketability discount.  We agree with Mr. Burns that the holding period component of the marketability discount is of little, if any, influence here.[18]

---

[17](...continued)
and each of the four remaining partners' share of that NAV would increase by $1.50, from $20 to $21.50.  Of course, we cannot say where between $12 and $20 the redemption price would settle, but, putting transaction costs aside, it would be in the economic interest of both the withdrawing partner and the remaining partners to have it settle <u>somewhere</u> in between.

[18]  We are mindful of one of respondent's expert's, Professor Kleinberger's, testimony that "nobody at arm's length would get into this deal" (meaning the partnership), and the implication to be drawn from that testimony that it would be hard to market an interest in the partnership.  Professor Kleinberger,
(continued...)

(4) Conclusion

Mr. Burns has persuaded us that a hypothetical purchaser of an LP unit would demand and get a price concession to reflect the market access component of the marketability discount but would get little if any price concession to reflect the holding period component of that discount.  On the record before us, and considering the expert testimony presented, we cannot determine any better estimate of an appropriate marketability discount than Mr. Burns's estimate, 12.5 percent, and we find accordingly.

(5) Paragraph 9.3

Since we have determined to disregard paragraph 9.3 in determining the values of the gifts, we need not address the parties' differences with respect to its effects on those values.[19]

---

[18](...continued)
however, was not called as an expert on valuation; he did not offer any opinion as to the value of an existing LP unit, and, although we are unpersuaded by one of petitioners' expert's, Mr. Ingham's, opinion as to an appropriate marketability discount, he stopped at 35 percent.

[19]  We note in passing that when asked to determine the fair market values of the gifts disregarding the impact of paragraph 9.3, the parties' experts took different approaches.  Mr. Burns simply disregarded the additional discount on account of paragraph 9.3 that he had applied sequentially after applying the minority interest and marketability discounts that he thought appropriate.  See infra appendixes A-D.  Mr. Ingham added an amount to what he had determined to be the freely traded value of an LP unit (i.e., the unit's proportional share of the partnership's NAV) minus his calculation of the appropriate minority interest discount.  See infra appendixes A-D, final portion:  "Mr. Ingham's computation -- effect of par. 9.3".  We fail to see the logic of Mr. Ingham's approach, since he did not take into account paragraph 9.3 in determining the freely traded value of an LP unit.  He is adding back an amount to show his disregard of a provision (par. 9.3) that he had not taken into
(continued...)

## V. Conclusion

On the premises stated, we calculate the fair market values of the gifts as follows:

### Table 13

|  | Date of gift | | | |
|---|---|---|---|---|
|  | 11/8/1999 f/b/o I. | 11/8/1999 in trust | 1/4/2000 in trust | 2/2/2001 in trust |
| Net asset value | $2,812,763 | $2,812,763 | $4,798,033 | $2,902,488 |
| Gift interest | 14.265% | 70.054% | 3.285% | 5.431% |
| Pro rata portion of net asset value | 401,241 | 1,970,453 | 157,615 | 157,634 |
| Discount for lack of control (11.32, 11.32, 14.34, and 4.63% respectively) | (45,420) | (223,055) | (22,602) | (7,298) |
|  | 355,820 | 1,747,398 | 135,013 | 150,336 |
| Discount for lack of marketability (12.5%) | (44,478) | (218,425) | (16,877) | (18,792) |
| Fair market value | 311,343 | 1,528,973 | 118,137 | 131,544 |

We find accordingly, except that, on the basis of respondent's position on brief that the amount of the 2001 gift is $131,033, we find that the total amount of that gift is that amount.

Decision will be entered

under Rule 155.

_____

[19](...continued)
account. If, for instance, the minority interest discount is set to zero, Mr. Ingham's approach would increase the freely traded value of an LP unit to an amount greater than its proportional share of the partnership's NAV, a result that we do not think he would support.

## APPENDIX A

### Comparison of Valuation Experts' Computations
### Gift of 1,426.5334 Limited Partnership Units f/b/o I.-Nov. 8, 1999

| | |
|---|---|
| Units outstanding | 10,000 |
| Units transferred | 1,426.5334 |
| Percentage of outstanding units transferred | 14.265% |

| | Petitioners' expert Mr. Ingham | | Respondent's expert Mr. Burns | |
|---|---|---|---|---|
| Net asset value (NAV): | Total | Per unit | Total | Per unit |
| 100% | $2,812,763 | 281.28 | 2,812,763 | 281.28 |
| NAV proportional to gift | $401,241 | 281.28 | 401,241 | 281.28 |

### Computations of fair market value (FMV)--restrictions contained in paragraph 9.3 of partnership agreement (par. 9.3) taken into account

| | Total | Per unit | Total | Per unit |
|---|---|---|---|---|
| Minority discount: | | | | |
| Mr. Ingham--14.4% | (57,779) | (40.50) | -- | -- |
| Mr. Burns--11.2% | -- | -- | (44,939) | (31.50) |
| Freely traded value | 343,462 | 240.77 | 356,302 | 249.77 |
| Marketability discount: | | | | |
| Mr. Ingham--35% | (120,212) | (84.27) | -- | -- |
| Mr. Burns--12.5% | -- | -- | (44,538) | (31.22) |
| Subtotal | $223,250 | 156.50 | 311,764 | 218.55 |
| Par. 9.3 discount: | | | | |
| Mr. Ingham--not separately stated | -- | -- | -- | -- |
| Mr. Burns--16.1% | -- | -- | (50,506) | (35.41) |
| FMV--par. 9.3 taken into account: | $223,250 | 156.50 | 261,258 | 183.15 |
| Total discounts | $177,990 | 124.77 | 139,982 | 98.13 |
| Total discounts as percentage of NAV | 44.4% | 44.4% | 34.9% | 34.9% |

### Computations of FMV--par. 9.3 disregarded

| | Total | Per unit | Total | Per unit |
|---|---|---|---|---|
| FMV above--par. 9.3 taken into account: | $223,250 | 156.50 | 261,258 | 183.15 |
| Mr. Ingham--add premium | 5,581 | 3.91 | -- | -- |
| Mr. Burns--add back 16.1% discount | -- | -- | 50,506 | 35.41 |
| FMV--par. 9.3 disregarded: | $228,832 | 160.41 | 311,764 | 218.55 |
| Total discounts | $172,409 | 120.86 | 89,477 | 62.72 |
| Total discounts as percentage of NAV | 43.0% | 43.0% | 22.3% | 22.3% |

### Mr. Ingham's computation--effect of par. 9.3

| | Total | Per unit |
|---|---|---|
| Freely traded value | $343,462 | 240.77 |
| Add 2.5% premium | 8,587 | 6.02 |
| Adjusted freely traded value | 352,049 | 246.79 |
| Subtract 35% marketability discount | 123,217 | 86.38 |
| FMV--par. 9.3 disregarded | 228,832 | 160.41 |
| FMV--par. 9.3 taken into account | 223,250 | 156.50 |
| Net increase in FMV-- par. 9.3 disregarded | 5,581 | 3.91 |

APPENDIX B

Comparison of Valuation Experts' Computations
Gift of 7,005.367 Limited Partnership Units f/b/o the children-Nov. 8, 1999

| | |
|---|---|
| Units outstanding | 10,000 |
| Units transferred | 7,005.367 |
| Percentage of outstanding units transferred | 70.054% |

| | Petitioners' expert Mr. Ingham | | Respondent's expert Mr. Burns | |
|---|---|---|---|---|
| Net asset value (NAV): | Total | Per unit | Total | Per unit |
| 100% | $2,812,763 | 281.28 | 2,812,763 | 281.28 |
| NAV proportional to gift | $1,970,453 | 281.28 | 1,970,453 | 281.28 |

Computations of fair market value (FMV)--restrictions contained in
paragraph 9.3 of partnership agreement (par. 9.3) taken into account

| | Total | Per unit | Total | Per unit |
|---|---|---|---|---|
| Minority discount: | | | | |
| Mr. Ingham--14.4% | (283,745) | (40.50) | -- | -- |
| Mr. Burns--11.2% | -- | -- | (220,691) | (31.50) |
| Freely traded value | 1,686,708 | 240.77 | 1,749,762 | 249.77 |
| Marketability discount: | | | | |
| Mr. Ingham--35% | (590,348) | (84.27) | -- | -- |
| Mr. Burns--12.5% | -- | -- | (218,720) | (31.22) |
| Subtotal | $1,096,360 | 156.50 | 1,531,042 | 218.55 |
| Par. 9.3 discount: | | | | |
| Mr. Ingham--not separately stated | -- | -- | -- | -- |
| Mr. Burns--16.1% | -- | -- | (248,029) | (35.41) |
| FMV--par. 9.3 taken into account: | $1,096,360 | 156.50 | 1,283,013 | 183.15 |
| Total discounts | $874,093 | 124.77 | 687,440 | 98.13 |
| Total discounts as percentage of NAV | 44.4% | 44.4% | 34.9% | 34.9% |

Computations of FMV--par. 9.3 disregarded

| | Total | Per unit | Total | Per unit |
|---|---|---|---|---|
| FMV above--par. 9.3 taken into account: | $1,096,360 | 156.50 | 1,283,013 | 183.15 |
| Mr. Ingham--add premium | 27,409 | 3.91 | -- | -- |
| Mr. Burns--add back 16.1% discount | -- | -- | 248,029 | 35.41 |
| FMV--par. 9.3 disregarded: | $1,123,769 | 160.41 | 1,531,042 | 218.55 |
| Total discounts | $846,684 | 120.86 | 439,411 | 62.72 |
| Total discounts as percentage of NAV | 43.0% | 43.0% | 22.3% | 22.3% |

Mr. Ingham's computation--effect of par. 9.3

| | Total | Per unit |
|---|---|---|
| Freely traded value | $1,686,708 | 240.77 |
| Add 2.5% premium | 42,168 | 6.02 |
| Adjusted freely traded value | 1,728,875 | 246.79 |
| Subtract 35% marketability discount | 605,106 | 86.38 |
| FMV--par. 9.3 disregarded | 1,123,769 | 160.41 |
| FMV--par. 9.3 taken into account | 1,096,360 | 156.50 |
| Net increase in FMV-- par. 9.3 disregarded | 27,409 | 3.91 |

APPENDIX C

Comparison of Valuation Experts' Computations
Gift of 469.704 Limited Partnership Units f/b/o the children-Jan. 4, 2000

Units outstanding                               14,296.71
Units transferred                                 469.704
Percentage of outstanding units transferred        3.285%

|  | Petitioners' expert Mr. Ingham | | Respondent's expert Mr. Burns | |
|---|---|---|---|---|
| Net asset value (NAV): | Total | Per unit | Total | Per unit |
| 100% | $4,672,758 | 326.84 | 4,798,033 | 335.60 |
| NAV proportional to gift | $153,500 | 326.84 | 157,615 | 335.60 |

Computations of fair market value (FMV)--restrictions contained in
paragraph 9.3 of partnership agreement (par. 9.3) taken into account

| | | | | |
|---|---|---|---|---|
| Minority discount: | | | | |
| Mr. Ingham--16.3% | (25,021) | (53.28) | -- | -- |
| Mr. Burns--13.4% | -- | -- | (21,120) | (44.97) |
| Freely traded value | 128,480 | 273.57 | 136,495 | 290.63 |
| Marketability discount: | | | | |
| Mr. Ingham--35% | (44,968) | (95.75) | -- | -- |
| Mr. Burns--12.5% | -- | -- | (17,062) | (36.33) |
| Subtotal | $83,512 | 177.82 | 119,433 | 254.30 |
| Par. 9.3 discount: | | | | |
| Mr. Ingham--not separately stated | -- | -- | -- | -- |
| Mr. Burns--16.1% | -- | -- | (19,229) | (40.94) |
| FMV--para. 9.3 taken into account: | $83,512 | 177.82 | 100,204 | 213.36 |
| Total discounts | $69,988 | 149.02 | 57,411 | 122.24 |
| Total discounts as percentage of NAV | 45.6% | 45.6% | 36.4% | 36.4% |

Computations of FMV--par. 9.3 disregarded

| | | | | |
|---|---|---|---|---|
| FMV above--par. 9.3 taken into account: | $83,512 | 177.82 | 100,204 | 213.36 |
| Mr. Ingham--add premium | 2,088 | 4.45 | -- | -- |
| Mr. Burns--add back 16.1% discount | -- | -- | 19,229 | 40.94 |
| FMV--par. 9.3 disregarded: | $85,600 | 182.26 | 119,433 | 254.30 |
| Total discounts | $67,901 | 144.58 | 38,182 | 81.30 |
| Total discounts as percentage of NAV | 44.2% | 44.2% | 24.2% | 24.2% |

Mr. Ingham's computation--effect of par. 9.3

| | Total | Per unit |
|---|---|---|
| Freely traded value | $128,480 | 273.57 |
| Add 2.5% premium | 3,212 | 6.84 |
| Adjusted freely traded value | 131,692 | 280.41 |
| Subtract 35% marketability discount | 46,092 | 98.14 |
| FMV--par. 9.3 disregarded | 85,600 | 182.26 |
| FMV--par. 9.3 taken into account | 83,512 | 177.82 |
| Net increase in FMV-- par. 9.3 disregarded | 2,088 | 4.45 |

APPENDIX D

Comparison of Valuation Experts' Computations
Gift of 860.7708 Limited Partnership Units f/b/o the Children-Feb. 2, 2001

```
Units outstanding                                  15,849.07
Units transferred                                  860.7708
Percentage of outstanding units transferred         5.431%
```

|  | Petitioners' expert Mr. Ingham | | Respondent's expert Mr. Burns | |
|---|---|---|---|---|
| Net asset value (NAV): | Total | Per unit | Total | Per unit |
| 100% | $2,798,331 | 176.56 | 2,902,488 | 183.13 |
| NAV proportional to gift | $151,977 | 176.56 | 157,634 | 183.13 |

Computations of fair market value (FMV)--restrictions contained in
paragraph 9.3 of partnership agreement (par. 9.3) taken into account

| | Total | Per unit | Total | Per unit |
|---|---|---|---|---|
| Minority discount: | | | | |
| Mr. Ingham--10.0% | (15,198) | (17.66) | -- | -- |
| Mr. Burns--5.0% | -- | -- | (7,882) | (9.16) |
| Freely traded value | 136,779 | 158.91 | 149,752 | 173.98 |
| Marketability discount: | | | | |
| Mr. Ingham--35% | (47,873) | (55.62) | -- | -- |
| Mr. Burns--12.5% | -- | -- | (18,719) | (21.75) |
| Subtotal | $88,906 | 103.29 | 131,033 | 152.23 |
| Par. 9.3 discount: | | | | |
| Mr. Ingham--not separately stated | -- | -- | -- | -- |
| Mr. Burns--17.7% | -- | -- | (23,193) | (26.94) |
| FMV--par. 9.3 taken into account: | $88,906 | 103.29 | 107,840 | 125.28 |
| Total discounts | $63,070 | 73.27 | 49,793 | 57.85 |
| Total discounts as percentage of NAV | 41.5% | 41.5% | 31.6% | 31.6% |

Computations of FMV--par. 9.3 disregarded

| | Total | Per unit | Total | Per unit |
|---|---|---|---|---|
| FMV above--par. 9.3 taken into account: | $88,906 | 103.29 | 107,840 | 125.28 |
| Mr. Ingham--add premium | 2,223 | 2.58 | -- | -- |
| Mr. Burns--add back 16.1% discount | -- | -- | 23,193 | 26.94 |
| FMV--par. 9.3 disregarded: | $91,129 | 105.87 | 131,033 | 152.23 |
| Total discounts | $60,848 | 70.69 | 26,601 | 30.90 |
| Total discounts as percentage of NAV | 40.0% | 40.0% | 16.9% | 16.9% |

Mr. Ingham's computation--effect of par. 9.3

| | Total | Per unit |
|---|---|---|
| Freely traded value | $136,779 | 158.91 |
| Add 2.5% premium | 3,419 | 3.97 |
| Adjusted freely traded value | 140,199 | 162.88 |
| Subtract 35% marketability discount | 49,070 | 57.01 |
| FMV--par. 9.3 disregarded | 91,129 | 105.87 |
| FMV--par. 9.3 taken into account | 88,906 | 103.29 |
| Net increase in FMV-- par. 9.3 disregarded | 2,223 | 2.58 |